Andrew R. Missel (OSB # 181793)
Hannah A. Goldblatt (OSB # 205324)
ADVOCATES FOR THE WEST
3701 SE Milwaukie Ave., Ste. B
Portland, OR 97202
(503) 506-5133
amissel@advocateswest.org
hgoldblatt@advocateswest.org

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| **ADVOCATES FOR THE WEST**, | Case No.: 3:24-cv-01136 |
| Plaintiff, | |
| v. | **COMPLAINT** |
| **BONNEVILLE POWER ADMINISTRATION**, | |
| Defendant. | |

INTRODUCTION

1. Plaintiff Advocates for the West ("AFW") brings suit under the Freedom of Information Act ("FOIA") to compel the Bonneville Power Administration ("BPA") to produce certain records and portions of records requested by AFW.

2.      The records at issue relate to a study commissioned by BPA called the "BPA Lower Snake River Dams Power Replacement Study." The study, which was released to the public in July 2022, was prepared by Energy & Environmental Economics, Inc. ("E3"), a San Francisco-based private company. The study will hereinafter be referred to as the "E3 Study."

3.      The E3 Study describes itself as "an independent study of the value of the lower Snake River dams ... to the Northwest power system." BPA has stated that "[t]he objective of the [E3 Study] is to provide BPA with an independent study of lower Snake River dam breaching and potential replacement resources from a realistic analytic, operational, and resource characteristic perspective."

4.      On April 20, 2023, AFW sent a FOIA request to BPA seeking records related to the E3 Study. BPA acknowledged receipt of the request on May 11, 2023. Then, in June 2023, BPA contacted AFW to see if AFW would be willing to narrow the scope of its request given the large number of records potentially responsive to the request.

5.      On June 28, 2023, AFW agreed to narrow the scope of its FOIA request. AFW asked that BPA release (1) whatever responsive records had already been gathered and (2) all emails "that include anyone from E3 in any address field (*e.g.*, to, from, cc)," including any attachments to those emails.

6.      It has now been over a year since AFW narrowed its request. BPA has not released any records to AFW. BPA has not even determined which records and parts of records will be released and which will be withheld under a FOIA exemption.

7. FOIA "does not condone agency personnel sitting behind accumulating mounds of FOIA requests and requiring each requester to 'take a number' and wait many months ... for the agency to comply." *Judicial Watch, Inc. v. U.S. Dep't of Homeland Sec.*, 895 F.3d 770, 789 (D.C. Cir. 2018) (Pillard, J., concurring). BPA's egregious delay in responding to AFW's FOIA request violates FOIA's requirement of prompt disclosure and amounts to an improper withholding of agency records.

8. AFW seeks an order from this Court requiring BPA to promptly release records responsive to AFW's FOIA request.

## JURISDICTION AND VENUE

9. Jurisdiction is proper in this Court under 28 U.S.C. § 1331 because this action arises under the laws of the United States. To the extent that FOIA itself contains a grant of subject-matter jurisdiction, that is also a basis for this Court's jurisdiction. *See* 5 U.S.C. § 552(a)(4)(B).

10. Venue is proper in this Court under 5 U.S.C. § 552(a)(4)(B) because the records at issue are, on information and belief, located in the District of Oregon at the headquarters of BPA. Venue is proper in the Portland Division because BPA's headquarters are in Portland.

11. The federal government waived sovereign immunity in this action pursuant to 5 U.S.C. § 552(a)(4)(B).

12. Because BPA has failed to make a timely "determination" as to AFW's request within the time limits set by FOIA, AFW is deemed to have exhausted administrative remedies. 5 U.S.C. § 552(a)(6)(C)(i).

**PARTIES**

13. Plaintiff Advocates for the West ("AFW") is a public interest, non-profit environmental law firm headquartered in Boise, Idaho, with an office in Portland, Oregon. AFW's mission is to defend western public lands, waterways, and wildlife on behalf of conservation groups and concerned citizens. AFW is particularly interested in gathering information to inform itself, its clients, its allies, and the public about BPA's activities and how those activities affect threatened and endangered fish species.

14. AFW educates the general public about the natural wonders of the West, and about land, resource, and wildlife decisions made by governmental and private entities that affect the natural environment and wildlife. AFW is effective at increasing public awareness of environmental matters, such as protection of endangered and threatened species, through public education and outreach activities: it employs a full-time Communications and Engagement Director who helps educate the public about the organization's efforts to protect the American West; it sends regular updates to its email list of over 2,800 recipients; it maintains an active social media presence; it routinely disseminates materials and information through its website and webinars; and it regularly engages in activities that attract the attention of the news media, allowing for wide dissemination of information obtained directly or indirectly from FOIA requests. AFW also routinely shares information it has gathered with its clients and with allied conservation and environmental organizations.

15. Many people who have attended AFW events and/or signed up for AFW's email list have expressed an interest in issues related to the lower Snake River

dams. In addition, AFW regularly works with and even represents conservation groups who support the breaching of the lower Snake River dams. Accordingly, AFW is very interested in the E3 Study.

16. Defendant Bonneville Power Administration ("BPA") is a federal power marketing administration that is part of the Department of Energy. "BPA is the marketing authority for almost all federally generated electric power in the Pacific Northwest." *Confederated Tribes of the Umatilla Indian Reservation v. Bonneville Power Admin.*, 342 F.3d 924, 928 (9th Cir. 2003). BPA is an "agency" within the meaning of 5 U.S.C. § 551 and is subject to FOIA.

## LEGAL BACKGROUND

17. The goal of FOIA is to ensure that the federal government provides "efficient, *prompt*, and full disclosure of information" to members of the public upon request. *Maydak v. U.S. Dep't of Justice*, 218 F.3d 760, 764 (D.C. Cir. 2000) (citation omitted). "[T]he statute does not condone agency personnel sitting behind accumulating mounds of FOIA requests and requiring each requester to 'take a number' and wait many months ... for the agency to comply." *Judicial Watch*, 895 F.3d at 789 (Pillard, J., concurring).

18. FOIA generally requires an agency to make a "determination" as to a request within 20 working days. 5 U.S.C. § 552(a)(6)(A). That deadline can be extended if there are "unusual circumstances." *Id.* § 552(a)(6)(B). Under the Department of Energy's FOIA regulations, "unusual circumstances" allow BPA to extend the determination deadline by at most 10 days. 10 C.F.R. § 1004.5(d)(1)(iii).

19.     An agency makes a "determination" as to a request by "determin[ing] and communicat[ing] the scope of the documents it intends to produce and withhold, and the reasons for withholding any documents." *Citizens for Responsibility and Ethics in Washington v. Fed. Election Com'n* (*CREW*), 711 F.3d 180, 186–88 (D.C. Cir. 2013). A "determination" must "inform the requester that it can appeal whatever portion of the 'determination' is adverse." *Id.* at 188; *see also* 5 U.S.C. § 552(a)(6)(A)(i)(III). An agency does not make a "determination" when it "decide[s] to later decide"—that is, when it "express[es] a future intention to produce non-exempt documents and claim exemptions." *CREW*, 711 F.3d at 185–86. A failure to make a timely determination violates FOIA. *Advocates for the West v. Bonneville Power Admin.*, Case No. 3:20-cv-01028-AC, 2021 WL 2229280, at *4–5 (D. Or. June 2, 2021).

20.     An agency must make records "promptly available" after receiving a FOIA request. 5 U.S.C. § 552(a)(3)(A). To make records "promptly available," an agency should release records "within days or a few weeks" of the "determination" deadline, "not months or years." *CREW*, 711 F.3d at 188. A failure to make records "promptly available" violates FOIA. *Long v. I.R.S.*, 693 F.2d 907, 910 (9th Cir. 1982); *accord Judicial Watch*, 895 F.3d at 781–82 (majority opinion).

21.     When responding to requests, agencies may withhold records or portions of records that fall under a FOIA exemption. *See* 5 U.S.C. § 552(b). These exemptions are construed narrowly. *Milner v. Dep't of Navy*, 562 U.S. 562, 571 (2011).

22.     One exemption potentially relevant here is Exemption 5, which allows agencies to withhold "inter-agency or intra-agency memorandums or letters that would

not be available by law to a party other than an agency in litigation with the agency ….." 5 U.S.C. § 552(b)(5). "Successful invocation of the exemption requires an agency to show that a document (1) is 'inter-agency' or 'intra-agency' in character, and (2) consists of material that would be protected as privileged in the civil discovery context." *Rojas v. FAA*, 989 F.3d 666, 672 (9th Cir. 2021) (en banc).

23. Communications between a federal agency and a non-federal entity may be withheld under Exemption 5 only if the non-federal entity "acted in a capacity functionally equivalent to that of an agency employee" with respect to the communications. *Rojas*, 989 F.3d at 675. This is called the "consultant corollary" to Exemption 5. *Id.* The consultant corollary does not apply if the non-federal entity's "outsider status was essential to [its] work." *Id.* at 675 n.3.

24. In addition, an agency cannot withhold a record or portion of a record under Exemption 5 unless "the agency reasonably foresees that disclosure would harm an interest protected by [the] exemption." 5 U.S.C. § 552(a)(8)(A)(i)(I). An agency cannot meet this burden by relying on "mere speculative or abstract fears, or fear of embarrassment." *Reporters Cmte. for Freedom of the Press v. FBI*, 3 F.4th 350, 369 (D.C. Cir. 2021) (cleaned up).

STATEMENT OF FACTS

**The Lower Snake River Dams Debate**

25. As the federal government recently acknowledged, the construction and operation of large federal hydroelectric dams in the Columbia River Basin has severely depleted native fish populations, especially populations of salmon and steelhead trout.

COMPLAINT                                                         7

26. Four of these dams are located on the lower Snake River in eastern Washington. These four dams—the lower Snake River dams—have led to the near extinction of several species of salmon that spawn in rivers in Idaho.

27. In recent years, there have been growing calls from Native American tribes, conservation and fishing groups, and others to breach or remove the lower Snake River dams. Utilities and various trade groups have pushed back on these calls for dam breaching, claiming that the lower Snake River dams are essential to the region's economy.

28. In the debate over breaching the lower Snake River dams, one major point of disagreement between pro- and anti-dam advocates is the economic cost of replacing the services provided by the dams. Pro-dam advocates argue that the cost of replacing the dams' services would be prohibitively large; anti-dam advocates argue that the cost would be much lower.

29. BPA is the federal agency that sells the power generated by the region's federal hydroelectric facilities, including the lower Snake River dams. Unlike most federal agencies, BPA is "self-funded": it does not rely on appropriations from Congress, but rather funds its activities with revenues from the sale of power and transmission services. As the Ninth Circuit has noted, BPA "function[s] more like a business than a governmental regulatory agency" in many respects. *Ass'n of Pub. Agency Customers, Inc. v. Bonneville Power Admin.*, 126 F.3d 1158, 1170 (9th Cir. 1997).

30. As a quasi-business, BPA has an economic interest in keeping the lower Snake River dams in place. Not surprisingly, then, BPA has often touted the economic

importance of the dams and stated or implied that breaching the dams would have serious adverse consequences for the region. For instance, in a fact sheet issued in March 2016, BPA called the dams "critical links in the carefully synchronized operation of the Northwest's federal hydropower system" and warned that breaching the dams could cost up to $2.6 billion and substantially increase greenhouse gas emissions. Similarly, in June 2021, BPA issued a press release in which BPA Administrator John Hairston characterized the lower Snake River dams as "vital to public safety and electric reliability for the region."

31. Understandably, many anti-dam advocates are suspicious of BPA's statements and analyses regarding the economic importance of the lower Snake River dams. Although BPA is a federal agency, its status as a quasi-business and its economic interest in the continued operation of the lower Snake River dams mean that its public pronouncements are often taken with a grain of salt.

**The E3 Study**

32. At some point in 2020 or 2021, BPA commissioned E3 to prepare a study to determine "[w]hat resources (one or more portfolios of resources) would be needed to replace the full energy and other grid services provided by the lower Snake River dams." According to BPA, "[t]he objective of the [study] [wa]s to provide BPA with an independent study of lower Snake River dam breaching and potential replacement resources from a realistic analytic, operational, and resource characteristic perspective, so that BPA can enhance its understanding of the complexity and expense involved in replacing those assets."

33. The E3 Study was released in July 2022. The study describes itself as "an independent study of the value of the lower Snake River dams ... to the Northwest power system."

34. The E3 Study concludes that "[r]eplacing the four lower Snake River dams while meeting clean energy goals and system reliability is possible but comes at a substantial cost, even assuming emerging technologies are available." The study estimates the total net present cost of breaching the dams as $11.2–$19.6 billion, and also estimates that breaching would lead to an increase in power bills of $100–$230 per household for public power customers in the region by 2045.

35. Upon its release, the E3 Study was cited by pro-dam advocates as evidence for their position that breaching the lower Snake River dams and replacing the dams' services would be prohibitively expensive. For instance, Northwest RiverPartners, a trade group that advocates against breaching the dams, put out a press release stating that "[t]he [E3] study confirms the fact these dams are irreplaceable for the region if we want to meet our emissions reduction objectives and maintain a reliable grid at an affordable cost."

36. The federal government, meanwhile, responded to the release of the E3 Study by reaffirming the study's independence. In a press release from July 2022, Kathleen Hogan, DOE's Principal Deputy Under Secretary for Infrastructure, said that "[t]he E3 study provides all stakeholders an independent analysis of the resources needed to maintain deployment of clean, reliable, and affordable power to communities in the Pacific Northwest under various scenarios." Similarly, when speaking to the

Northwest Power and Conservation Council in September 2022, BPA Administrator John Hairston stated that he thought it was "important for the region to understand … from an objective party … what was … necessary in terms of replacing the" power provided by the lower Snake River dams—the "objective party" being E3.

**AFW's FOIA Request**

37. On April 20, 2023, AFW sent a FOIA request to BPA seeking records related to the E3 Study. Specifically, AFW sought the following:

    a. All contracts, statements of work, and similar documents between BPA and E3 that were prepared or executed in connection with the E3 Study;

    b. All communications between BPA and E3 that relate in any way to the E3 Study, including any communications concerning the study's release, press stories about the study, etc.;

    c. All records that document, memorialize, or refer to any meetings, conversations, or other communications between BPA and E3 concerning the E3 Study; and

    d. All internal BPA memos, emails, etc. that refer to the E3 Study.

38. BPA acknowledged receipt of AFW's request on May 11, 2023, and assigned the request tracking number BPA-2023-00855-F. BPA invoked the "unusual circumstances" provision of 5 U.S.C. § 552(a)(6)(B). Under the Department of Energy's FOIA regulations, this extended BPA's deadline to make a "determination" to June 2,

2023, at the latest. However, BPA's acknowledgment letter told AFW that BPA did not expect to complete its response to AFW's request until August 23, 2023.

39. On June 22, 2023, BPA contacted AFW to inquire about the possibility of AFW narrowing the scope of its FOIA request. BPA informed AFW that it had already collected several hundred responsive records, but that collection efforts had slowed due to the fact that the search terms BPA was using to find records were returning a very large number of hits.

40. On June 28, 2023, AFW responded to BPA and agreed to narrow the scope of the request. Counsel for AFW told BPA the following:

> [I]n addition to whatever records have already been collected, I am willing to re-scope the request to seek only "all emails from [DATE] to the date of search that include anyone from E3 in any address field (*e.g.*, to, from, cc)," where [DATE] is either January 1, 2019 or some later date that, according to knowledgeable BPA personnel, marks the start of BPA's efforts to commission the [E3] Study. Of course, I would like any attachments to responsive emails as well.

41. On August 22, 2023, BPA informed AFW that it was still gathering and processing records. BPA extended its target response date to December 27, 2023.

42. On December 26, 2023, BPA informed AFW that it was still gathering and processing records. BPA extended its target response date to May 29, 2024.

43. On May 28, 2024, BPA informed AFW that BPA had "gathered agency records responsive to [AFW's] request," but that the "records [we]re ... undergoing a required 5 U.S.C. § 552(b) exemption review." BPA's letter stated that records were being reviewed for possible withholdings under Exemptions 4 and 5, 5 U.S.C. § 552(b)(4) & (5). BPA extended the target response date to June 28, 2024.

44.  On June 26, 2024, BPA informed AFW that the gathered records were still undergoing "exemption review" and extended the target response date to July 31, 2024.

## FIRST CLAIM FOR RELIEF
## FAILURE TO MAKE A TIMELY DETERMINATION

45.  AFW realleges and incorporates by reference the allegations in paragraphs 1 through 44, inclusive.

46.  BPA has still not made a "determination" as to AFW's request. At most, BPA has "decide[d] to later decide"—that is, it has "express[ed] a future intention to produce non-exempt documents and claim exemptions." *CREW*, 711 F.3d at 185–86. That does not amount to a determination.

47.  The latest that BPA could have made a timely determination was June 2, 2023.

48.  By failing to make a timely determination as to AFW's request, BPA has violated and continues to violate FOIA.

## SECOND CLAIM FOR RELIEF
## IMPROPER WITHHOLDING OF RECORDS/
## FAILURE TO PROMPTLY DISCLOSE RECORDS

49.  AFW realleges and incorporates by reference the allegations in paragraphs 1 through 44, inclusive.

50.  BPA has not released any records in response to AFW's request, even though such records exist, and even though BPA received AFW's request over a year ago.

51.     Since AFW narrowed its request on June 28, 2023, BPA has only had to search for emails that include E3 in an address field. Somehow, over a year later, BPA has yet to release records from that very limited search.

52.     Based on its letters to AFW, it appears that BPA is engaging in a lengthy review process to determine if any records are exempt under Exemption 5. Given that any emails sent to or received from E3 cannot be withheld under Exemption 5 because they are not intra- or inter-agency documents, this review process is unreasonably long.

53.     BPA's egregious delay in releasing records responsive to AFW's request violates FOIA's requirement that an agency make records "promptly available" upon request and amounts to an improper withholding of agency records.

WHEREFORE, AFW prays for relief as set forth below.

## PRAYER FOR RELIEF

A.     Order BPA to immediately make a "determination" as to AFW's request;

B.     Order BPA to immediately release all non-exempt records and portions of records responsive to AFW's request;

C.     Enter such other declaratory relief and temporary, preliminary, or permanent injunctive relief as may be prayed for hereafter by AFW;

D.     Award AFW its reasonable costs, litigation expenses, and attorneys' fees associated with this litigation pursuant to FOIA and/or any other provision of law allowing for the recovery of such expenses; and

E.     Grant such further relief as the Court deems just and proper in order to provide AFW with relief and protect the public interest.

Dated: July 11, 2024                         Respectfully submitted,

*/s/ Andrew R. Missel*
Andrew R. Missel
Oregon Bar # 181793
Hannah A. Goldblatt
Oregon Bar # 205324
ADVOCATES FOR THE WEST
3701 SE Milwaukie Ave., Ste. B
Portland, OR 97202
(503) 506-5133
amissel@advocateswest.org
hgoldblatt@advocateswest.org

COMPLAINT                              15